## THE HENRY McNAMEE.
## THE GEORGE A. KEATING.

### HORAN v. GALLAGHER BROS. SAND & GRAVEL CORPORATION et al.

No. 15842.

District Court, E. D. New York.

Nov. 25, 1940.

Mahar & Mason, of New York City (Frank C. Mason, of New York City, of counsel), for libellant.

John R. Stewart, of New York City, for Gallagher Bros. Sand & Gravel Corporation.

Bigham, Englar, Jones & Houston, of New York City (Richard F. Shaw, of New York City, of counsel), for Road Material Corporation and Vanbro Construction Corporation.

Foley & Martin, of New York City (Christopher E. Heckman, of New York City, of counsel), for tug George A. Keating.

GALSTON, District Judge.

The libel alleges that the Henry McNamee, under charter to the Gallagher Brothers Sand & Gravel Corporation, loaded with sand consigned to the Road Materials Corporation for delivery at Fresh Kills Creek, was caused to go aground at the dock of the consignee and damaged as a result of having been directed by those in authority at the plant of the consignee to an unsafe berth.

The scow Henry McNamee was under charter to Gallagher Brothers Sand & Gravel Corporation. While loaded with sand she was taken in tow, on October 23, 1939, at the Gallagher stake-boat in New York Harbor by the tug George A. Keating. Thereafter the tow proceeded to Carteret, and then at about 3 P. M. headed for the Road Material Corporation dock in Fresh Kills Creek, Staten Island. On the way to Fresh Kills the tug had the scow on short hawsers, and just prior to reaching the inlet at Fresh Kills the tug proceeded with the scow alongside. As they stood outside the inlet the tug blew its whistle three or four times. At that time someone from the Road Material Corporation plant was observed approaching the dock by those on the tug and tow. This unidentified individual stepped on the scow Henry Steers, which was next to the dock and extending beyond the end of the dock, and ordered the captain of the Keating to tie the scow behind the Henry Steers, saying that would be all right for the night. Accordingly lines were cast to the Steers by the deck hand of the Keating and the bargee of the scow, and the McNamee was made fast with her bow to the stern of the Henry Steers. The scowman took no soundings, relying on the statement that the scow was safe for the night, and that the lines would be shifted in the morning.

It may be said parenthetically that throughout the trial there was no identification of the individual who gave these directions, but I am persuaded that there was some such person, that he had come from the plant of the Road Company and that he did give directions with respect to the lines and the berth. The deck hand of the Keating corroborated the scow master's testimony in this respect and the captain of the Keating corroborated to the extent of saying that an unidentified man from the dock made motions for him to come in as they stood at the opening to the inlet.

The witnesses on behalf of the Road Materials Corporation offered a different version of how the McNamee was berthed. In effect they said that when the Keating and tow arrived at the inlet, because of the crowded condition therein there was no available berth at the dock for the scow. The basin is a small one and the dock is L shaped, one part forming the head of the basin and the other extending at right angles towards the Creek. In addition to the Henry Steers, there were also two light Traprock scows, the Brimstone and Freestone, at the dock adjacent to the bulkhead; and but shortly before the arrival of the Keating and its tow the tug Crow had arrived at Fresh Kills at about 4:50 P. M. on October 23, 1939, with the loaded scows Blackburn and Carlson. It was while the Crow was maneuvering to take out the light scows Brimstone and Freestone that the Keating arrived.

Shannon, who was the oiler for the two cranes on the dock testified that he had left the plant at about 4 P. M. before either the Crow or the Keating arrived with their tows, and that on the morning following, when he came to work at 6 o'clock, he observed the McNamee lying in a sunken condition end on to the Blackburn. Robert Vanderbilt, who had charge of the dock, testified that he was on the dock at the time that the Keating arrived. He denied that he had beckoned the Keating to come in and said that instead he had waved to the tug to go out as there was no room until the Crow had moved out with the two empty scows. He also denied that either he himself or anybody acting under his authority had assisted in making the lines of the McNamee fast. He said that the scow was made fast to the Blackburn but without his approval and that no one except himself had authority to direct the McNamee where to tie up. There is some confirmation by the master and mate of the Crow that Vanderbilt had waved to the Keating and that the Crow had sounded a danger signal to the Keating for this purpose. They testified that the Keating placed the McNamee astern of the Blackburn and that that berth was unsafe.

Thus on the one hand it is contended that the Road Materials Corporation was at fault in having designated an unsafe berth, and on the other hand is the denial that any such berth had been authorized, and fault is ascribed to the Keating for not having waited until the Crow had left with her two empty scows. Vanderbilt believed that the McNamee had been left in a bad place, astern of the Blackburn. He had no recollection of whether he was on the dock after the Keating left and said that he had had no opportunity to notify the Keating that the scow had been left in an unsafe berth. After the Crow left the basin he said that the water was "too far down and the McNamee was starting to set up there and I couldn't move it" though he had attempted to shift the boat with the crane.

It seems to me that the story by the construction company's witnesses lacks probability, particularly in respect to their assertion that the McNamee was tied to the Blackburn with but one line. Stevenson, the bargee, impressed me as being an honest and intelligent witness. Also he was an experienced scowman and it is entirely unlikely that he would have left his scow on one line to swing as it might during the night. Stevenson testified that in addition to the lines to the Henry Steers there was a line to the Blackburn, as illustrated in his diagram, Libellant's Exhibit 1. This line was put on his middle bitt, having been thrown from the Blackburn at the time that the Crow was moving around in the basin.

Now though it cannot be said that there was an altogether satisfactory description by those on the Keating and the scow of the employee of the Road Materials Corporation who directed the McNamee to tie up astern of the Henry Steers, there is no doubt that Vanderbilt was there at the time of the arrival of the Keating and McNamee; and it is incredible that he should have permitted the McNamee to be put in an unsafe berth, particularly in the manner in which he describes the tying up by means of but one line of the McNamee to the Blackburn. He knew that the change of tide from high water at night to low water in the morning would cause the grounding of the scow because of the low water prevailing. Vanderbilt testified that after the Crow had left he put a line on the Carlson which was slightly headed into the Steers tow at the dock. The Blackburn was just astern of the Carlson with a line on the Carlson. At about 5:30 or 6 P. M. he attempted to pull the three boats and said: "I don't believe I pulled the boats over 25 feet, and that would bring them all up that much more."

Then he found one was aground but could not identify which of the three.

Later he said that they were all grounded. At this point his testimony became

938

quite confused and he was unable to tell who had assisted him in the movement of these three boats.

█ I reach the conclusion, therefore, that the barge McNamee was tied up as Stevenson described and accept his testimony over that of the respondents, Road Materials Corporation.

█ The consignee is bound to provide a safe berth, The Eastchester, 2 Cir., 20 F.2d 357; and since Stevenson accepted the berth designated by the consignee, he was under no obligation to make soundings, as required in Nassau No. 10, Nassau Sand & Gravel Co. v. Red Star Towing & Transp. Co., 2 Cir., 62 F.2d 356, 1933 A.M.C. 54.

█ No proved fault is ascribed to the Keating but, of course, the Gallagher Brothers Sand & Gravel Corporation as charterer has a secondary liability to the owner of the barge. The only charge of direct negligence is that the McNamee was loaded too deeply, but the libellant failed establish that allegation. It appears that she was normally loaded and made the journey safely through Long Island Sound from Port Jefferson to New York Harbor and thence to the consignee's plant.

The libellant may have a decree in conformity with the foregoing opinion.

Submit findings of fact and conclusions of law in conformity with the foregoing opinion.